A03A1923. COTTRELL, INC. v. WILLIAMS et al.
(596 SE2d 789)

PHIPPS, Judge.

After sustaining serious injuries from a fire inside the cab of his tractor-trailer truck, Holton Williams and his wife sued Cottrell, Inc., the company that had modified his truck cab by installing an exposed 12-volt direct current switch positioned on the floorboard. Williams alleged that the switch was defective in its design, defective in its manufacture, defective in lacking adequate warnings as to dangers, and not reasonably suited for the purpose intended. He claimed that the absence of a protective cover on the 12-volt direct current switch created a danger that enabled foreign objects to come in contact with the switch.

At trial, Williams presented evidence that the fire was triggered by a metal coat hanger coming in contact with the exposed switch. The jury returned a verdict for the Williamses, and the court accordingly entered a judgment of $600,000 to Williams and $150,000 to his wife on her loss of consortium claim. Cottrell filed a motion for judgment notwithstanding the verdict, or in the alternative, motion for new trial, which was denied. In this appeal, Cottrell challenges several evidentiary rulings and the denial of its motion for directed verdict on proximate cause. We find no legal error and affirm.

---

[41] (Citation and punctuation omitted.) *Alexander v. State*, 263 Ga. 474, 477 (2) (d) (435 SE2d 187) (1993).

Because a verdict is presumptively valid, all evidence and every presumption and inference arising from that evidence must be construed most favorably toward upholding that verdict.[1] So considered, the evidence shows that Cottrell designs, develops, and manufactures auto transport equipment. Elwood Feldman, Cottrell's vice chairman, testified that Cottrell obtains a chassis from a truck manufacturer, then installs "our structure on that truck and . . . what other apparatus is necessary to perform the necessary functions of the piece of equipment." For car hauling trucks, Cottrell adds a power source by installing either a "power takeoff or electric hoist system," depending upon the customer's request. Feldman testified that the electric hoist system "[c]onsists of a 12-volt electric motor, DC motor, and powers a pump that supplies fluid on to the hydraulic cylinders on that entire unit." Cottrell had installed this hydraulics system on the 1994 Ford L9000 that Williams was driving. The switch for the hydraulics system operated directly off the truck's batteries. Using what Feldman described as a little L-shaped metal bracket, Cottrell mounted the switch to the middle of the floorboard of the cab. Cottrell did not cover the switch because "we just felt there was never a need to cover it." When Feldman was asked, "If you took a piece of metal and you touched it to the hot terminal of the disconnect switch and that piece of metal came in contact with another portion of metal, let's just say the frame here, the mounting bracket of the switch, would that create a spark or generate heat in that piece of metal?" Feldman responded by asking "if you go from the hot post to that ground?" When told yes, Feldman responded, "Yes, you could do that."

The incident at issue occurred shortly after Williams had refueled his truck at a terminal in Jacksonville, Florida. While en route to I-95, according to Williams, he drove over some rough sections of roadway. In anticipation of entering I-95 from the far left lane, Williams put his left turn signal on. As he looked back in his left rearview mirror and waited for traffic to clear, out of the corner of his eye he saw a fire nearly a foot high down on the floorboard. He testified that the fire was to his right side, "[d]own on the switch, the master control switch." According to Williams, a pair of his pants that had been hanging on a clothes hanger when he left the terminal just minutes before had fallen "on top of the switch" and he could see the pants burning. Williams leaned to his left to avoid the fire and opened the door, planning "to pull the brakes on the left side of the steering wheel." He testified that "until I opened the door," it was a slow fire. But, after he opened the door, Williams heard a "whoosh" and the fire expanded rapidly. Williams testified that to detach his seat belt, he

---

[1] *Nationwide Mut. Fire Ins. Co. v. Wiley*, 220 Ga. App. 442, 443 (2) (469 SE2d 302) (1996).

had to "put my hand down in the fire" and that by that time, "my clothes had caught on fire, too." Williams managed to escape the fire by jumping out of the burning cab, availing himself of his training as a paratrooper. Williams suffered severe burns to his right arm, right side, and to the right side of his face. His right arm required skin grafting. He also injured his shoulder and foot as a result of jumping from the moving truck.

Williams repeatedly denied having any aerosol cans containing volatile substances inside his cab and testified that he kept only a can of glass cleaner inside his cab. Through his expert, Williams established that the glass cleaner had a flammability rating of zero. Williams denied that an explosion had taken place while he was inside the cab. He also testified without contradiction that "I didn't get any burns on my legs."

The trial court allowed testimony about two similar incidents involving two other truck drivers and the same unprotected master switch located on the floorboard. Before permitting the two other truck drivers to testify, the trial court heard a proffer of their anticipated testimony. After considering whether each incident was, in fact, substantially similar, the court decided to admit the evidence but narrowed consideration by the jury of the incidents.

Before the first driver, Ricky Hobbs, took the stand, the court instructed the jury to consider his testimony "for a very limited purpose, if it establishes this purpose, and that's for you to decide, and that's the purpose of showing that metal connecting the two terminals on a similar switch to that involved in this case creates heat, if it does show that." Hobbs testified that he also had driven an L9000 car hauling rig with the same master disconnect switch located on the floor. The switch was exposed. Hobbs described an experience that took place when he had inadvertently dropped a coat hanger and the hanger had come in contact with the master switch. Hobbs testified that "[w]hen it fell in the floor it touched the two wires on the back [of the master switch] and started turning red." Hobbs testified that within seconds, the hanger started heating up. He explained that he was able to avoid a fire by kicking the hanger up against a metal door, implicitly away from flammable material.

Evocious Stanley also worked as a car hauling truck driver of the L9000. Before he testified, the trial court instructed the jury that "this next witness is offered again for a limited purpose, for the limited purpose, if it does establish, that metal connecting the two terminals on the switch gets hot." Stanley testified that he had driven an Allied unit L9000 Ford tractor that had a master control switch identical to the one in Williams's cab. Stanley recalled having a similar experience where a clothes hanger had made contact with the

uncovered master disconnect switch on the floorboard. Stanley testified, "I was traveling on I-20 leaving Anniston, Alabama. And I reached to get a coat hanger and hang my coat up. And I dropped the coat hanger down on the switch. And it burned the coat hanger in two. The coat hanger turned red hot." Stanley had reached for a towel because "I couldn't touch it with my bare hands." Stanley testified that by the time he pulled over to the side of the road to throw the hanger out the window, "the towel had caught fire and started blazing."

Thomas M. Driggers, a registered professional engineer, testified as an expert. Driggers testified that about half of Driggers & Associates' work involved electrical systems and that he had experience in truck or vehicle wiring, in fire investigations involving buildings, and in investigating electrical accidents. Driggers testified that in his opinion, "the fire that had occurred in Mr. Williams' truck was caused by a faulty switch that was located on the floor next to where his driver's seat was." After reviewing Cottrell's description of the circuitry, Driggers decided that the terminal design was dangerous and defective because the "two ought wire" that was connected directly to the battery was exposed and would carry a lot of current. He explained that "If I were to connect any piece of metal in the truck, gear shift, seat, this bracket right here which I think is the culprit, and this particular terminal, I get a violent reaction and causes heat and a spark." In his opinion, the danger posed by Cottrell's uncovered switch design was "very severe" should any kind of "high resistance metal" come into contact with the switch.

Using a simplified model of a switch, Driggers demonstrated the electrical circuitry principle. He testified that the hot terminal in question "has potential power of seven hundred to eight hundred amps constantly all the time." Analogizing to welding activity, Driggers testified that most welders "will operate up to two hundred fifty amps" and have "a little bit higher voltage" but "the action is the same." He explained that a coat hanger had just to touch the positive terminal and any grounded place in the cab to short circuit. Driggers estimated that a coat hanger so involved would reach "around a thousand degrees."

Driggers estimated that covering the terminals with protective plastic would cost "a dollar or two dollars maximum." He also testified that "good old electrical tape also would do the job by just taping these terminals, several layers of electrical tape."

The jury viewed a videotaped demonstration of Driggers using a model that he created to illustrate his testimony. During the video, Driggers commented, "See the flash? Coat hanger severed. The glow

is still there." In his opinion, an electrical fire had occurred in the cab. He also testified that an aerosol can "did not ignite [or] start the fire" as Cottrell theorized.

Cottrell offered contrary evidence to support its theory that the cause of the fire was a puncture of a highly flammable aerosol can by Williams's seat. In part, Cottrell relied upon the expert testimony of Herbert J. Childs, a licensed private investigator. Childs testified as an expert in fire cause and origin. Childs testified that "the origin area of the fire was around the front of the driver's seat, between there and the dog house[2] and the left door and down low near the floor and like in the vicinity of an aerosol container that remained there." When asked, "What did you feel was the cause of this fire?" Childs responded, "The aerosol container was crushed against the frame of the seat, and it appeared that it had been damaged, releasing its contents." Childs detected a heat pattern "that's kind of behind the left hip of the driver's seat." Childs testified that the master control switch "was well out of the origin area of the fire," adding, "I saw no indication of the cause or the origin being anywhere other than this area right in front of the driver's seat related to this canister." In conducting his investigation, Childs admittedly relied upon information supplied by Williams's employer that the sequence of events had been: a "sudden fire erupted in cab, explosion. Driver jumped out while vehicle still in motion." Childs conceded that if a metal object had come in contact with the hot, positive terminal of the master control switch and with a grounded portion of the cab, then "yes, it could produce a spark."

Jerry L. Purswell, Ph.D., an expert in cause and origin, ergonomics, design engineering, volatile gases, and containers, also testified that "the switch was not involved in any extent and terms of creating a fire." Purswell opined that a sharp point on Williams's seat could have punctured an aerosol can or Williams could have kicked the can, resulting in a puncture. Purswell stated, "my conclusion is that there was no way that a coat hanger could have been melted and ignited clothing like this." He also testified, "In my opinion, there's no way the switch could have caused the fire." But when asked, "So if the switch is in the off position and a coat hanger, say, falls down and lays across those terminals . . . or contacts across the hot terminal and the negative terminal, it could create a spark, that contact with the coat hanger?" Purswell responded, "Yes, it could."

---

[2] Another witness described a "dog house" as "a central area of the truck and . . . where the part of the engine is and transmission is coming up."

1. In two separate claims of error, Cottrell contends that the trial court erred by allowing Hobbs and Stanley to testify without first making a finding of substantial similarity under *Cooper Tire &c. Co. v. Crosby*.[3] Cottrell claims that the trial court misapprehended the facts of the accident and misapplied the applicable law. Cottrell argues that a limiting instruction cannot substitute for a finding by the trial court that the substantial similarity rule has been met. In addition, Cottrell contends that the limiting instruction "confused the issues before the jury."

In product liability cases, like this one, the "rule of substantial similarity" prohibits the admission of evidence of other transactions, occurrences, or claims unless the proponent first shows that there is a "substantial similarity" between such evidence and the claim at issue in the litigation.[4] Without the requisite showing of substantial similarity, the evidence is irrelevant as a matter of law.[5] Before admitting proffered evidence of the other incidents in a product liability action, the trial court must decide whether the rule of substantial similarity has been met.[6] "Absent clear abuse, the trial courts' exercise of discretion in admitting or refusing to admit such evidence is entitled to deference, and should not be hamstrung by restrictive rulings."[7]

In *Cooper Tire*, upon which Cottrell relies, the Supreme Court held that the exclusion of certain tire adjustment data was correct because the proponent of that evidence failed to show: (1) that the tire in issue shared a common design and manufacturing process with the adjusted tires; (2) that the adjusted tires and the one in issue both suffered from a common defect; and (3) that any common defects shared the same causation.[8] Here, however, both Hobbs and Stanley testified that their cabs used the same type of hydraulic master control switch on the floorboard as in Williams's truck. In addition to the common design and common placement of the master switch, Hobbs and Stanley each recounted separate incidents involving a wire coat hanger coming in direct contact with the unprotected switch. Both men testified that within seconds of making contact with the switch, the wire hanger started heating up. Accompanied by the limiting instruction, the testimony was offered only to show that the switch could cause a coat hanger to heat up rapidly, not that it would cause a fire or injure the driver. The fact that neither of their cabs

---

[3] 273 Ga. 454 (543 SE2d 21) (2001).

[4] See *Mack Trucks, Inc. v. Conkle*, 263 Ga. 539, 544 (3) (436 SE2d 635) (1993).

[5] *Ray v. Ford Motor Co.*, 237 Ga. App. 316, 317 (1) (514 SE2d 227) (1999).

[6] Id.

[7] *Cooper Tire*, 273 Ga. at 457 (2).

[8] Id. at 456 (1).

became engulfed in flames and the fact that neither man sustained injuries did not make the testimony inadmissible. Although Cottrell correctly points out that Williams was unable to testify that he observed the metal coat hanger that held his pants make contact with the switch, he surmised that it had done so because in the past the hanger and pants had fallen together. Under these facts, we cannot say that the trial court abused its discretion by allowing the testimony.[9]

2. (a) Cottrell contends that the trial court erred by permitting Driggers to testify, over objection, about scientific matters beyond his expertise. Cottrell complains that the trial court impermissibly allowed Driggers to offer, without a proper foundation, opinions on cause and origin, flammability, and volatility, matters outside his expertise.

The qualification of a witness as an expert will not be disturbed absent an abuse of discretion by the trial court.[10] OCGA § 24-9-67 does not require formal education in the subject at hand; experience and self-study can suffice.[11] Driggers testified that he had some knowledge of electrical systems and vehicle wiring and in investigating electrical fires. As such, it was permissible for Driggers to offer an opinion that the origin of the fire was electrical. And, contrary to Cottrell's claim, the trial court did not allow Driggers to testify to any significant degree about volatility. As to flammability, Driggers was simply asked to explain the meaning of a rating on the label on the type of glass cleaner kept by Williams in his cab. After attesting that his education, training, and experience had familiarized him with the flammability rating on the can, Driggers was then permitted to testify about that rating. In these circumstances, we cannot say that the trial court manifestly abused its discretion in allowing Driggers to give his opinion.[12]

(b) Cottrell asserts that the trial court erred by admitting the videotape reconstruction created by Driggers. The record shows, however, that the videotape was allowed only for the demonstrative purpose of showing a hanger melting after contact with a switch.

Use of a videotape by an expert to illustrate the expert's testimony is generally permissible.[13] Here, Driggers created a model to explicate certain electrical principles and taped a demonstration of those principles in action. The transcript indicates that the videotape

---

[9] See *Volkswagen of America v. Gentry*, 254 Ga. App. 888, 895 (8) (564 SE2d 733) (2002).

[10] See *Williamson v. Harvey Smith, Inc.*, 246 Ga. App. 745, 749 (5) (542 SE2d 151) (2000).

[11] See id.

[12] See *Dimambro Northend Assoc. v. Williams*, 169 Ga. App. 219, 220 (1) (312 SE2d 386) (1983).

[13] *J. B. Hunt Transport v. Brown*, 236 Ga. App. 634, 635-636 (1) (b) (512 SE2d 34) (1999).

was used for demonstrative purposes only, and contrary to Cottrell's claim, the record does not reflect its admission in evidence. There was no error.

3. Cottrell contends that the trial court erred by denying its motion for directed verdict on the issue of proximate cause. In its brief, Cottrell claims that "[s]ince Driggers did not testify to an opinion within a reasonable degree of scientific certainty that the hanger brushing against the switch caused the fire, then [Williams] should not be entitled as a matter of law to recover damages and [Cottrell's] motion for directed verdict should have been granted."

Notwithstanding Cottrell's claim to the contrary, "an expert is not required to prove within a reasonable degree of scientific certainty his opinion of how an accident occurred."[14] Driggers did, in fact, testify that the switch was defective and posed a "very severe" danger of a violent reaction if any "high resistence [sic] metal" came in contact with it. When asked, "Now, do you have an opinion to a reasonable degree of professional engineering certainty, Mr. Driggers, whether or not Cottrell's uncovered exposed terminal design was a defective design?" he responded, "I would say, yes, sir." Driggers also testified that in his opinion, the cause of the fire was the faulty switch.

A directed verdict is appropriate only when the evidence does not conflict as to any material issue and the evidence, when construed most favorably toward the party opposing the motion, demands a particular verdict.[15] But here, Williams and Cottrell presented conflicting evidence to explain the origin and cause of the fire that burned Williams's body. In such circumstances, we cannot say that a particular verdict was demanded.

*Judgment affirmed. Blackburn, P. J., and Ellington, J., concur.*

DECIDED MARCH 18, 2004.

*Hall, Booth, Smith & Slover, John E. Hall, Jr., Alexander H. Booth, Beth W. Kanik*, for appellant.

*Garland, Samuel & Loeb, David E. Tuszynski*, for appellees.

---

[14] Id. at 635 (1) (a).
[15] *St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137 (1) (508 SE2d 646) (1998).